UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICK FLYNN, et al.,

                Plaintiffs,

     v.

CITY OF SANTA CLARA, et al.,

                Defendants.

Case No. 18-cv-07688-EMC

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS**

Docket No. 31

Plaintiffs in this case are Patrick Flynn, Kyle Flynn, and Lauren Alcarez. They have sued the Santa Clara Stadium Authority, several cities, and multiple police officers who work for the cities, alleging that their federal and state civil rights were violated when they were arrested at a 49ers game at Levi's Stadium in November 2017. Currently pending before the Court is Defendants' motion to dismiss. Defendants do not challenge all claims pled in the complaint; instead, they challenge only those claims related to First Amendment retaliation and false arrest.

Having considered the parties' briefs, as well as the oral argument of counsel, the Court hereby **GRANTS** the motion to dismiss.

## I.     FACTUAL & PROCEDURAL BACKGROUND

Defendants in the case are as follows:

(1) The Santa Clara Stadium Authority.

(2) The City of Santa Clara.

(3) The City of Mountain View.

(4) The City of Gilroy.

(5) Officer Nicholas Cusimano.

(6) Special Events Officer Theodore Rodgers.

1    (7) Special Events Officer Duane Walker.

2    (8) Officer Janice Rivera.

3    (9) Officer Kevin Fraser.

4    (10)    Officer Tom Nelson.

5    (11)    Officer Dan Moreno.

6    (12)    Officer Hugo Del Moral.

7    (13)    Sgt. Jacob Malae.

8    Plaintiffs' claims against Defendants are based on, *inter alia*, the following allegations in

9    the complaint.

10    The City of Santa Clara owns Levi's Stadium.  *See* Compl. ¶ 22.  "Before working an

11    event at Levi's Stadium, all police officers go through a stadium training, which includes

12    explaining the stadium's 'Code of Conduct.'"  Compl. ¶ 23.

13    On November 12, 2017, Plaintiffs attended a 49ers-Giants game at Levi's Stadium.  *See*

14    Compl. ¶ 21.  The Flynns, who are brothers and Giants' fans, "were seated in the rows closest to

15    the field."  Compl. ¶ 24.  During the second half of the game, the Flynns "were flipping off the

16    Giants players and yelling 'You fucking suck' at them."  Compl. ¶ 26.  Officer Cusimano

17    approached them and "told them to quit flipping off the players and to sit down."  Compl. ¶ 26.

18    The Flynns complied.  *See* Compl. ¶ 26.

19    Later, after the 49ers scored, the Flynns "stood up, approached the railing separating the

20    stands from the field, and again flipped off the Giants players while screaming 'You fucking

21    suck!'"  Compl. ¶ 27.  Officer Cusimano determined that the Flynns were violating the stadium's

22    Code of Conduct and "notified Stadium Communications that he needed officers to eject [the

23    Flynns]."  Compl. ¶ 28.  Officer Cusimano made this decision even though no complaints had

24    been made about the Flynns "by fans, staff, or players."  Compl. ¶ 30.

25    Several officers arrived in response to Officer Cusimano's call.  Officer Nelson instructed

26    Officer Rivera to eject the Flynns "due to their behavior."  Compl. ¶ 33.

27    A.    Kyle Flynn

28    When Officer Rivera, along with Officer Walker, approached, Kyle Flynn stayed in his

2

seat. *See* Compl. ¶ 34. The officers tried to pull Kyle out of his seat, and, at some point, Officer Walker put his arm around Kyle's neck and choked him. *See* Compl. ¶ 35. Eventually, Kyle was handcuffed and then taken to a Temporary Holding Facility beneath the stadium. *See* Compl. ¶ 36.

While in the Temporary Holding Facility, Kyle "called out for a lawyer, challenged the officers' legal authority to arrest him, and protested the warrantless search of his brother." Compl. ¶ 37. The officers' response (which officers is not clear) was to put Kyle "in a control hold used for combative prisoners and make him lay "prone on the ground with his legs crossed." Compl. ¶ 37. "Officer Fraser then placed Kyle . . . in a total body restraint called a WRAP which immobilizes the legs and upper torso. Kyle['s] face was also wrapped. He was then leaned against the wall and left in the restraint device for at least thirty to forty minutes." Compl. ¶ 37.

Subsequently, Kyle was charged with a violation of California Penal Code § 148(a)(1). Section 148(a)(1) provides in relevant part that "[e]very person who willfully resists, delays, or obstructs any public officer [or] peace officer . . . in the discharge or attempt to discharge any duty of his or her officer or employment" is subject to a fine or imprisonment or both. Cal. Pen. Code § 148(a)(1). The Santa Clara District Attorney's Office later dismissed the charge "in the interests of justice and for insufficiency of the evidence." Compl. ¶ 38.

B.  Patrick Flynn

When Patrick Flynn saw how Officers Rivera and Walker were treating his brother, he protested their "brutality by shouting . . . and pointing at them" and then by "descend[ing] down the steps" and taking a "knee in the aisle at the bottom of the section." Compl. ¶ 39. Officer Rivera told Officer Rodgers that Patrick "'needed to go.'" Compl. ¶ 40.

Officer Rodgers, along with Officer Malae, approached Patrick. Patrick remained in his kneeling position. The officers tried to remove Patrick, and then Officer Rodgers, along with Officer Cusimano and Officer Moreno, tried to pull Patrick's hands off the railing that he was gripping. Sgt. Malae then put Patrick in a carotid restraint and choked him. *See* Compl. ¶¶ 43-44. Patrick stood up to stop the choking but still held on to the railing. In response, Officer Rodgers, "removed his collapsible baton and struck Patrick['s] fingers and knuckles. Patrick['s] hand had

3

recently been broken." Compl. ¶ 45.

At some point, the scuffle between the officers and Patrick resulted in Patrick being "pushed over the railing and onto the field, some ten (10) feet below." Compl. ¶ 48. Once Patrick fell onto the field, Officer Del Moral rolled Patrick onto his stomach, pulled his left hand behind his back, and struck his body two or three times. *See* Compl. ¶ 49. In addition, while Patrick was on the ground and pinned by four or five officers, Sgt. Malae used a taser on Patrick, and Officer Nelson used his knee to strike Patrick in the face. *See* Compl. ¶ 50.

Thereafter, Patrick was placed in handcuffs, arrested, and taken to the Temporary Holding Facility. *See* Compl. ¶ 50.

C.   <u>Ms. Alcarez</u>

Ms. Alcarez was standing behind Officer Rodgers when he used his baton on Patrick Flynn. She knew that Patrick had recently broken his hand and yelled, "'[L]eave him alone!'" and "'[S]top hitting him!'" Compl. ¶ 46. When Officer Rodgers did not stop, Ms. Alcarez grabbed the baton. Officer Rodgers twisted the baton to free it from her grip and elbowed Ms. Alcarez in the chest and shoulder. *See* Compl. ¶ 46. Officer Cusimano then "grabbed Ms. Alcarez's right arm, pulled it behind her back[,] and put it into a wrist lock." Compl. ¶ 47.

Subsequently, Ms. Alvarez was handcuffed, arrested, and taken to the Temporary Holding Facility. *See* Compl. ¶ 47.

D.   <u>Causes of Action</u>

Based on, *inter alia*, the above allegations, Plaintiffs assert the following causes of action:

(1) First Amendment retaliation in violation of 42 U.S.C. § 1983. (This claim is asserted by the Flynns only, and not Ms. Alcarez.)

(2) False arrest in violation of § 1983 (*e.g.*, no warrant and no probable cause).

(3) Excessive force in § 1983.

(4) False arrest and excessive force in violation of California Civil Code § 52.1 (the Bane Act).

(5) Battery.

(6) False arrest without a warrant.

1    (7) Negligent infliction of emotional distress (based on excessive force only).

2    Defendants move to dismiss the First Amendment retaliation claim and any claim that is

3    predicated on false arrest.  (Defendants do not contest claims predicated on excessive force.)  For

4    both the retaliation and false arrest-based claims, Defendants argue failure to state a claim for

5    relief as well as qualified immunity.

6    **II.    DISCUSSION**

7    A.    Legal Standard

8

9    To survive a [12(b)(6)] motion to dismiss for failure to state a claim
     after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S.

10   662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544
     (2007), [a plaintiff's] factual allegations [in the complaint] "must . . .
     suggest that the claim has at least a plausible chance of success."  In

11   other words, [the] complaint "must allege 'factual content that
     allows the court to draw the reasonable inference that the defendant

12   is liable for the misconduct alleged.'"

13   . . . . [The Ninth Circuit has] settled on a two-step process for
     evaluating pleadings:

14

15   First, to be entitled to the presumption of truth,
     allegations in a complaint or counterclaim may not

16   simply recite the elements of a cause of action, but
     must contain sufficient allegations of underlying facts

17   to give fair notice and to enable the opposing party to
     defend itself effectively.  Second, the factual

18   allegations that are taken as true must plausibly
     suggest an entitlement to relief, such that it is not

19   unfair to require the opposing party to be subjected to
     the expense of discovery and continued litigation.

20

21   *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014).

22   Notably,

23   [t]he plausibility standard is not akin to a "probability requirement,"
     but it asks for more than a sheer possibility that a defendant has

24   acted unlawfully.  Where a complaint pleads facts that are "merely
     consistent with" a defendant's liability, it "stops short of the line

25   between possibility and plausibility 'of entitlement to relief.'"

26   *Iqbal*, 556 U.S. at 678.

27   "When . . . defendants assert qualified immunity in a motion to dismiss under Rule

28   12(b)(6), 'dismissal is not appropriate unless [a court] can determine, based on the complaint

United States District Court
Northern District of California

itself, that qualified immunity applies.'" *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016). If a plaintiff "allege[s] acts to which qualified immunity may not apply," dismissal is not appropriate. *Groten v. Cal.*, 251 F.3d 844, 851 (9th Cir. 2001); *see also Hernandez v. City of San Jose*, 241 F. Supp. 3d 959, 975 (N.D. Cal. 2017) (noting that "in many cases it is impossible to determine based on a complaint alone that qualified immunity is warranted" in which case "a court may deny a qualified immunity defense without prejudice and after further factual development a defendant may re-raise the qualified immunity issue 'at summary judgment or at trial'").

B.  First Amendment Retaliation Claim

As noted above, the Flynns only, and not Ms. Alcarez, assert a First Amendment retaliation claim.

> There are three elements to a First Amendment retaliation claim . . . :
>
>> [A] plaintiff must show that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity[,] and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.
>
> Once a plaintiff has made such a showing, the burden shifts to the government to show that it "would have taken the same action even in the absence of the protected conduct."

*O'Brien*, 818 F.3d at 932.

In the instant case, the Flynns' retaliation claim has two factual predicates: (1) that the police mistreated Kyle Flynn for flipping off Giants players and yelling, "You fucking suck!" (more specifically, as counsel clarified at the hearing, for engaging in this speech *after* Officer Cusimano told him not to do so) and (2) that the police mistreated Patrick Flynn for "taking a knee" in protest with respect to how the police were treating his brother Kyle. The mistreatment (*i.e.*, retaliation) identified by the Flynns was the police officers' use of excessive force. *See* Opp'n at 13 (asserting that the retaliation was not the attempt to eject the Flynns from the stadium but rather the excessive force used during the arrest).

1.  "Lumping" of Defendants

As an initial matter, Defendants argue that the First Amendment retaliation claim should

be dismissed – at least as to the individual police officers – because the Flynns have, for the most part, lumped together the various officers.  Defendants make a fair point in arguing that the officers have largely been lumped together.  Defendants also legitimately argue that, if the Flynns are claiming that they were mistreated because of their speech, then they must show that each officer knew about their speech in the first place.  *See Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (noting that "the plaintiff must allege a *causal connection* between the adverse action and the protected conduct") (emphasis added); *see also Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (same).

　　To be clear, a causal connection could be shown if a police officer knew about the Flynns' speech and did something himself or herself, *or* if the officer knew about the Flynns' speech and had someone else take action against the Flynns.  *See King v. Cty. of Los Angeles*, 885 F.3d 548, 559 (9th Cir. 2018) (noting that § 1983 causation can be shown where defendant sets in motion a series of acts by others).  But the Flynns have not explained how there could be a causal connection if an officer did not have knowledge about the speech in the first place.  *See Thomas v. DeCastro*, No. 14-CV-6409 (KMK), 2019 U.S. Dist. LEXIS 55153, at *32 (S.D.N.Y. Mar. 29, 2019) (indicating that a "plaintiff's failure to allege any knowledge of the protected conduct results in a 'fail[ure] to establish a plausible causal connection' for the purposes of a retaliation claim"); *Hammler v. Alvarez*, No. 18-CV-326-AJB(WVG), 2019 U.S. Dist. LEXIS 17720, at *24 (S.D. Cal. Feb. 4, 2019) (stating that, "[b]ecause Plaintiff alleges no facts to show that [defendant] had any prior knowledge of this grievance, there are no facts to suggest that [defendant] issued the [rules violation report] in retaliation for the filing of a grievance"); *cf. Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (in addressing FMLA retaliation, noting that there must be a causal connection between the protected activity and the adverse action and that, "[i]n order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action" – "[a] decision maker cannot have been motivated to retaliate by something unknown to him").

　　At the hearing, the Flynns suggested for the first time that a police officer without

knowledge of their speech could still be held liable for First Amendment retaliation because the "initiating" officer (Officer Cusimano) did know about the Flynns' speech and all officers thereafter acted "in concert" with one another. But the Flynns have cited no authority to support this proposition.

The Court therefore finds that dismissal of the individual officers, other than Officer Cusimano, is appropriate because of the "lumping" problem. The Flynns have leave to amend to cure this deficiency.

### 2. Kyle Flynn: Flipping Off Giants Players and Yelling, "You Fucking Suck!"

Defendants argue next that, as to all Defendants, the Flynns have failed to state a claim for relief because they have failed to adequately allege that they "engaged in speech and conduct protected by the First Amendment." *O'Brien*, 818 F.3d at 932. The Court addresses first the alleged speech/conduct of Kyle Flynn and then turns to the alleged speech/conduct of Patrick Flynn.

As noted above, Kyle asserts that his flipping off Giants players and yelling, "You fucking suck!" after being told to stop constitutes speech and conduct protected by the First Amendment. But whether the speech and conduct is protected and to what extent turns on whether Levi's Stadium was, at the relevant time, a designated public forum, a limited public forum, or a nonpublic forum.[1] If the stadium was, for example, a limited public forum or a nonpublic forum, then then First Amendment would protect against viewpoint discrimination only, *see Hopper v. City of Pasco*, 241 F.3d 1067, 1075 (9th Cir. 2001) (stating that, for a limited public forum, "'restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible'"); *Preminger v. Peake*, 536 F.3d 1000, 1009 (9th Cir. 2008) (stating that "[a] restriction on expressive conduct in a nonpublic forum must be viewpoint neutral"), and, at the hearing, Kyle conceded that the police retaliation at issue in the instant case as to him was not based on viewpoint (*i.e.*, because Kyle was criticizing the Giants).

Kyle seems to assume that Levi's Stadium was a designated public forum for which there

---

[1] The Flynns do not appear to make any claim that the stadium was a traditional public forum (akin to a park or street).

8

are strict limits on content-based regulation.  But notably the complaint lacks any factual

allegations to support the position that the stadium was, in fact, a designated public forum.

To the extent Kyle contends that, as a matter of law, Levi's Stadium was a designated

public forum, the Court does not agree.  Whether a place is a designated public forum turns on the

facts.  *See Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1045-46 (9th Cir. 2018) (stating

that "determining whether a location is properly categorized as a public forum involves largely

factual questions"); *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1018 (D.C. Cir. 1988) (noting

that "the decision as to whether a forum is public usually invokes a factual inquiry" that requires a

factual record; "[a] principal difficulty with the district court's dismissal of the complaint under

Rule 12(b)(6) is that the court decided the public forum question on the merits in the absence of a

factual record" – it was not "possible to resolve the public forum issue in this case on the basis of

the bare fact that the property in question is a football stadium").[2]

The main case on which Kyle relies, *Cinevision Corp. v. Burbank*, 745 F.2d 560 (9th Cir.

1984), is not the contrary.  *Cinevision* reached a jury trial and thus there was a factual record.[3]

Moreover, *Cinevision* is distinguishable because it involved an amphitheater and not a sports

stadium; therefore, the theater was likely designed for and dedicated to expressive activity.  *See id.*

at 569-70 (where plaintiff had a contract with Burbank that gave it the right to promote concerts in

a municipally-owned amphitheater and the City Council rejected six of plaintiff's proposed

---

[2] Resolution of the factual issue generally turns on what the intent of the government is – *i.e.*, was there an intent on the part of the government to open up the forum to expressive activity?  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (stating that a designated public forum is "public property which the State has opened for use by the public as a place for expressive activity[;] [t]he Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place"); *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 497 (9th Cir. 2015) (stating that, for a designated public forum, "the government must intend to grant 'general access' to its property for expressive use, either by the general public or by a particular class of speakers," while, for a limited public forum, "the government intends to grant only 'selective access' by imposing either speaker-based or subject-matter limitations").

[3] Similarly, the main cases on which Defendants rely in support of their argument that Levi's Stadium was a nonpublic forum also had developed factual records.  *See I Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Expo. Auth.*, 691 F.2d 155, 158 (3d Cir. 1982) (noting that lower court denied plaintiffs' claims for preliminary relief and then, "after a comprehensive hearing, refused to grant a permanent injunction"); *Hubbard Broad., Inc. v. Metro. Sports Facilities Comm'n*, 797 F.2d 552, 554 (8th Cir. 1986) (noting that lower court granted defendants' motions for summary judgment on plaintiff's First Amendment claim).

concerts, rejecting Burbank's argument that the amphitheater was not a public forum;

amphitheater was a designated public forum because, "by granting [plaintiff] access to the Bowl

for the presentation of music by a variety of performers, the City transformed publicly owned

property into a public forum for expressive activity, even if the expressive activity is promoted by

a single entity"). And even if Levi's Stadium does, at times, serve as a venue for concerts, *see*

Reply at 7, that does not mean that the stadium is always a designated public forum. As the D.C.

Circuit has noted, "stadiums may not have the same public forum status in all places at all times."

*Stewart*, 863 F.2d at 1018 n.8.

Thus, Kyle fails to allege protected speech – a necessary predicate to his retaliation claim.

### 3. Patrick Flynn: Taking a Knee

Patrick Flynn also claims First Amendment retaliation on the basis that the police

mistreated him after he took a knee in protest of how the police were mistreating his brother. The

analysis for Patrick's claim is different from that above for Kyle's claim. This is because, even if

Levi's Stadium was a limited public forum or a nonpublic one, the First Amendment would still

protect against viewpoint discrimination. Viewing the allegations in his favor, Patrick has raised

an arguable viewpoint discrimination claim here.

Defendants assert that Patrick's viewpoint discrimination claim has no merit because the

police had already made the decision to eject Patrick before he took a knee. *See* Mot. at 13

(arguing that, "[o]bviously[,] a person subject to proper arrest or ejection cannot evade such an

arrest or ejection by initiating a form of expression"). But this argument fails to take into account

that Patrick claims the police retaliation was the use of excessive force. At this juncture in the

proceedings, it is plausible that, even if the police had decided to eject Patrick before he took a

knee, the officers subsequently decided to use excessive force against him after they saw him take

a knee.

Defendants contend still that, even if Patrick's viewpoint discrimination claim cannot be

dismissed in its entirety at this point in the proceedings, qualified immunity should be given to the

individual officers now. However, viewpoint discrimination is barred under clearly established

First Amendment law. *See, e.g.*, *Preminger*, 536 F.3d at 1009 (stating that "[a] restriction on

expressive conduct in a nonpublic forum must be viewpoint neutral[,] [b]ut in a nonpublic forum, the government has 'the right to make distinctions in access on the basis of subject matter and speaker identity,' as long as the distinctions are not 'an effort to suppress expression merely because public officials oppose the speaker's view'").

C.      False Arrest Claims

Defendants argue next that any claim based in whole or in part on false arrest should be dismissed because, based on the allegations in the complaint, there was probable cause to arrest based on the following:

(1) violation of Santa Clara City Code § 9.05.160(g) (providing that the following is prohibited within the stadium: "No person shall behave in so disruptive, unsafe, noisy, boisterous or profane manner as to disturb spectators or participants at any stadium event so that assigned personnel must address the person to cease or prevent a recurrence of the disruptive, unsafe, noisy, boisterous or profane behavior");

(2) violation of California Penal Code § 602(o) (providing that a person willfully commits a trespass by "[r]efusing or failing to leave land, real property, or structures belonging to or lawfully occupied by another and not open to the general public upon being requested to leave by (a) a peace officer at the request of the owner, the owner's agent, or the person in lawful possession, and upon being informed by the peace officer that he or she is acting at the request of the owner, the owner's agent, or the person in lawful possession");

(3) violation of California Penal Code § 602.1 (providing that a person intentionally interferes with a lawful business carried on by the owner or agent of a business establishment open to the public "by obstructing or intimidating those attempting to carry on business, or their customers, and who refuses to leave the premises of the business establishment after being requested to leave . . . by a peace officer acting at the request of the owner or the owner's agent"); and/or

(4) violation of California Penal Code § 148(a)(1) (prohibiting a person from willfully resisting, delaying, or obstructing any public officer, peace officer, or emergency

1    medical technician "in the discharge or attempt to discharge any duty of his or her

2    office or employment").

3    Defendants add that, even if probable cause were lacking, the individual police officers should still

4    have qualified immunity for the false arrest claims.

5    "In determining whether there was probable cause to arrest, [a court] look[s] to 'the totality

6    of circumstances known to the arresting officers, [to determine if] a prudent person would have

7    concluded there was a fair probability that [the suspect] had committed a crime.'" *Crowe v. Cty.*

8    *of San Diego*, 593 F.3d 841, 867 (9th Cir. 2010); *see also United States v. Gourde*, 440 F.3d 1065,

9    1069 (9th Cir. 2006) (noting that fair probability does not mean "certainty or even a

10   preponderance of the evidence"). "While conclusive evidence of guilt is . . . not necessary under

11   this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason

12   to suspect are not enough.'" *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).

13   "'Probable cause is an objective standard[,] and the officer's subjective intention in exercising his

14   discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth

15   Amendment purposes.'" *United States v. Struckman*, 603 F.3d 731, 740 (9th Cir. 2010).

16   Probable cause in the criminal context and probable cause in the civil context are not

17   treated exactly the same. The Ninth Circuit has stated:

18   > Our task in determining whether probable cause to arrest existed as a
19   > matter of law in [a] § 1983 action is slightly different from a similar
     > determination in the context of a direct review of a criminal arrest.
20   > In the latter situation, we are called upon to review both law and fact
     > and to draw the line as to what is and is not reasonable behavior.
     > We are not always in agreement as to its location, but a line must be
21   > drawn. *By contrast, in a § 1983 action the factual matters*
     > *underlying the judgment of reasonableness generally mean that*
22   > *probable cause is a question for the jury; and summary judgment is*
     > *appropriate only if no reasonable jury could find that the officers*
23   > *did or did not have probable cause to arrest.*

24   *McKenzie v. Lamb*, 738 F.2d 1005, 1007-08 (9th Cir. 1984) (emphasis added).

25   That being said, in cases where probable cause is a close call, qualified immunity becomes

26   a factor. In the context of probable cause to arrest, Judge Brazil has noted that

27   > [t]he right not to be arrested without probable cause . . . is, of course,
     > clearly established. But "probable cause" is a concept that can be
28   > infected with a fair amount of elasticity and indeterminacy. There is

12

> no formula for its determination, no standard set of criteria or conditions by which it can reliably be identified. . . .
>
> Given these considerations, and the law's recognition that good police officers might well be frozen into inaction far too often if they were exposed to civil liability every time a judge or jury, after the fact, reached a different conclusion than the officers had about whether there was probable cause, *an officer is entitled to qualified immunity whenever, on facts not subject to genuine dispute, it is clear that whether probable cause existed was a close question.* Stated differently, if we conceptualize "actual" probable cause (as determined by the highest court to address the issue after the fact) as occupying a solid sphere, the law recognizes a modestly dimensioned penumbral zone around that sphere in which ultimately erroneous decisions about probable cause remain immunized from suit.

*Manning v. City of Rohnert Park*, No. C 06-3435WDB, 2009 U.S. Dist. LEXIS 18436, at *19 (N.D. Cal. Mar. 3, 2009) (emphasis added); *see also Moore v. City of Oakland*, 242 F. Supp. 3d 891, 899 (N.D. Cal. 2017) (Corley, J.) (stating that "[t]he question is 'whether it is reasonably arguable that there was probable cause for the arrest – that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity'").

       1.      <u>Santa Clara City Code § 9.05.160(g)</u>

As noted above, Defendants first assert probable cause to arrest based on Santa Clara City Code § 9.05.160(g). Section 9.05.160(g) provides: "No person shall behave in so disruptive, unsafe, noisy, boisterous or profane manner as to disturb spectators or participants at any stadium event so that assigned personnel must address the person to cease or prevent a recurrence of the disruptive, unsafe, noisy, boisterous or profane behavior." Defs.' RJN, Ex. B. Defendants make this argument with respect to the Flynns only, not Ms. Alcarez. According to Defendants, the Flynns engaged in disruptive or profane behavior by flipping off Giants players and yelling, "You fucking suck!"

The Flynns argue that Defendants' reliance on § 9.05.160(g) as a basis for the arrest must necessarily be rejected because, once Defendants chose only to *eject* the Flynns based on such conduct, Defendants could not rely on the same conduct to arrest – *i.e.*, there needed to be a new basis to arrest. In support of this argument, the Flynns cite *Goddard v. Kelley*, 629 F. Supp. 2d 115 (D. Mass. 2009). *Goddard*, however, is materially distinguishable on the facts. More

13

specifically, in *Goddard*, the ejection of the plaintiffs from the sports stadium was actually completed, and thus there needed to be a new basis to arrest once the plaintiffs came back into the stadium (upon a request by a security officer to get their names to include in an ejection report). *See id.* at 126-27. The instant case does not involve a comparable "break in continuity and causation." *Id.* at 127.

That being said, the Court is not persuaded by Defendants' position that it can make a probable cause ruling at this early juncture in the proceedings. Although probable cause requires only a fair probability that a crime was committed, the Court finds that whether there was probable cause to arrest pursuant to § 9.05.160(g) is a question of fact that cannot be resolved at the 12(b)(6) phase. A factual record is needed as to whether the Flynns behaved in "so disruptive" a manner as to disturb other people at the stadium. *See, e.g.*, Compl. ¶ 30 (alleging that no complaints had been made about the Flynns "by fans, staff, or players").

However, the Court does find that the individual officers are entitled to qualified immunity for making an arrest pursuant to § 9.05.160(g). As noted above, if there is a close call on probable cause, then qualified immunity enters the picture to protect an officer who has engaged in a reasonable mistake. Even if the Flynns' behavior was not the subject of a complaint by other people, that does not mean that their conduct did not violate § 9.05.160(g), and it was at least a reasonable mistake for a police officer to so conclude given the allegations in the complaint.[4] *See* Compl. ¶ 27 (alleging that the Flynns "stood up, approached the railing separating the stands from the field, and again flipped off the Giants players while screaming 'You fucking suck!'").

2. California Penal Code §§ 602(o) and 602.1

Defendants contend that, even if there was no probable cause to arrest the Flynns for a violation of Santa Clara City Code § 9.05.160(g), there was still probable cause to arrest the two

---

[4] When a court evaluates probable cause, the subjective intent of the officer is not relevant. *See Whren v. United States*, 517 U.S. 806, 812 (1996) ("Not only have we never held, outside the context of inventory search or administrative inspection . . . , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary."). The qualified immunity analysis is also an objective one, "focusing on whether 'a reasonable officer could have believed that probable cause existed to arrest the plaintiff.'" *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 14 F.3d 457, 462 (9th Cir. 1994).

for a violation of California Penal Code §§ 602(o) and 602.1.  As noted above:

- Section § 602(o) provides that a person willfully commits a trespass by "[r]efusing or failing to leave land, real property, or structures belonging to or lawfully occupied by another and not open to the general public upon being requested to leave by (a) a peace officer *at the request of the owner, the owner's agent, or the person in lawful possession*, and upon being informed by the peace officer that he or she is acting *at the request of the owner, the owner's agent, or the person in lawful possession*."  Cal. Pen. Code § 602(o) (emphasis added).

- Section 602.1 provides that a person intentionally interferes with a lawful business carried on by the owner or agent of a business establishment open to the public "by obstructing or intimidating those attempting to carry on business, or their customers, and who refuses to leave the premises of the business establishment after being requested to leave . . . by a peace officer *acting at the request of the owner or the owner's agent*."  *Id.* § 602.1 (emphasis added).

Here, the Flynns have shown that, at the very least, there is a factual question as to whether the officers had probable cause to arrest them for violating §§ 602(o) and 602.1.  More specifically, there are no allegations in the complaint that a Levi's Stadium representative asked the officers to make the Flynns leave; if there was no such request, then a critical element to trespass is missing.  And given the lack of facts on probable cause, then there can be no ruling on qualified immunity at this juncture.  That is, the officers could not claim a reasonable mistake on trespass if there was never a request by the owner or owner's agent in the first instance.

### 3.   California Penal Code § 148(a)(1)

Finally, Defendants argue that, for both the Flynns and Ms. Alcarez, there was probable cause to arrest for a violation of California Penal Code § 148(a)(1).  That statute prohibits a person from willfully resisting, delaying, or obstructing any public officer, peace officer, or emergency medical technician "in the discharge or attempt to discharge any duty of his or her office or employment."  Cal. Pen. Code § 148(a)(1).

///

15

In the instant case, Defendants assert that there was probable cause to arrest the Flynns because they were subject to ejection, *see, e.g.*, Defs.' RJN, Ex. C (Levi's Stadium's Code of Conduct),[5] but they did not comply with the officers' attempts to remove them from the stadium. *See* Reply at 8. In response, the Flynns protest that they did not know there had been a decision to eject. *See* Opp'n at 16 (arguing that the Flynns did not know that "defendants were instructed to eject them from the Stadium"). But the Flynns' position is problematic because, even if the officers did not *expressly* tell the Flynns that they were being ejected, it is implausible that the Flynns did not understand such given that (as alleged in the complaint) (1) Officer Cusimano had previously told the Flynns to stop flipping off players and yelling, "You fucking suck!" and (2) the officers were bodily trying to get Kyle Flynn out of his seat and Patrick Flynn away from the railing.

The Flynns argue still that the officers had no basis to arrest them for resistance under § 148(a)(1) because (1) as a legal matter, a violation of § 148(a)(1) requires that an officer be lawfully performing his or her duties and (2) an officer is not lawfully performing his or her duties if he or she is (a) unlawfully arresting the criminal defendant *or* (b) using excessive force against the criminal defendant. *See* CALCRIM 2656 (instruction on resisting a peace officer in violation of § 148(a)(1)); *see also* CALCRIM 2670 (instruction on lawful performance by a peace officer) (stating that "[a] peace officer is not lawfully performing his or her duties if he or she is (unlawfully arresting . . . someone [or] using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest"). According to the Flynns, because they have alleged that the force used to arrest them was excessive and unreasonable, any lawful arrest under

---

[5] Levi's Stadium's Code of Conduct provides in relevant part that the stadium "PROMOTES AN ENVIRONMENT WHERE GUESTS CAN ENJOY THEIR GAME DAY EXPERIENCE FREE FROM ANY OF THE FOLLOWING" – *e.g.*, "[o]bscene or abusive language and/or behavior"; "[f]ighting, taunting, or threatening remarks and/or gestures"; "[f]ailure to follow the directions of law enforcement, security, ushers, ticket takers or any other [stadium[ personnel]"; "[o]ther actions that cause a disruption and/or hinder the enjoyment of the event"; "[a]ny behavior that impairs the safety and/or enjoyment of the event from other guests." Defs.' RJN, Ex. C. The Code of Conduct continues: "Committing any of the above listed violations may result in ejection from the stadium, prohibition from attending future events, and/or arrest." Defs.' RJN, Ex. C.

§ 148(a)(1) (*i.e.*, for refusal to comply with ejection) became unlawful, and thus there was no probable cause to arrest for a violation of § 148(a)(1).

The Bench Notes for CALCRIM 2656 cite *People v. White*, Cal. App. 3d 161 (1980), in support. In *White*, the state court did state that, "where excessive force is used in making what otherwise is a technically lawful arrest, the arrest becomes unlawful and a defendant may not be convicted of an offense which requires the officer to be engaged in the performance of his duties." *Id.* at 164. But, notably, a state court decision from 2018 put limits on how *White* should be interpreted.

> Defendant relies on White in asserting that the use of excessive force at any point during an encounter invalidates a violation of section 148(a)(1). *White*, however, discussed only the requirement that a jury be instructed that the use of excessive force during an arrest invalidates that arrest. *White* did not address whether a defendant may be convicted of violating section 148(a)(1) if he or she obstructs, delays, or resists an officer who is lawfully performing his or her duties, and the officer subsequently uses excessive force in arresting the defendant for the completed section 148(a)(1) violation.
>
> . . . .
>
> Although the defendant in *White* engaged in conduct that could have been the basis for a section 148(a)(1) conviction prior to the officer's use of excessive force, the court did not consider whether the defendant's conviction could have been based on the pre-arrest conduct. Thus, that case is of little assistance to resolving the question presented here, where the jury's question indicated it found a completed violation of section 148(a)(1) prior to the officers' use of excessive force." The instructional error in *White* was the trial court's complete failure to instruct the jury that an officer is not engaged in the performance of his or her duties if he or she makes an arrest with excessive force. The *White* court did not consider whether the defendant could have been convicted of violating section 148(a)(1) if the jury found that a completed violation preceded any use of excessive force.

*People v. Williams*, 26 Cal. App. 5th 71, 83-84 (2018).

The *Williams* court went on to conclude that a criminal defendant could be found guilty of violating § 148(a)(1) so long as there was a completed violation *before* the officers engaged in excessive force. The court found support for this conclusion from a California Supreme Court case, *Yount v. City of Sacramento*, 43 Cal. 4th 885 (2008). *Yount* involved a *Heck v. Humphrey*, 512 U.S. 477 (1994), issue – *i.e.*, whether the plaintiff's civil rights action against officers was

barred because it would necessarily imply the invalidity of the plaintiff's criminal conviction and the conviction was not yet invalidated. The *Yount* court held that, while the plaintiff "was barred from pursuing a claim that the officers were unjustified in using '*any* force,' [he] *could* pursue his claim with respect to the officer's use of *deadly* force, because that would not imply that the section 148(a)(1) violation was invalid." *Williams*, 26 Cal. App. 5th at 86 (emphasis in original).

> In explaining why the officers' use of deadly force required a separate analysis from the claim of excessive force, the *Yount* court acknowledged that "'two isolated factual contexts'" could exist within "'one continuous chain of events.'" The court indicated that in such a case, it would be appropriate to examine the timing of an officer's excessive force in determining whether a claim was barred by *Heck*. "'For example, a defendant might resist a lawful arrest, to which the arresting officers might respond with excessive force to subdue him. The subsequent use of excessive force would not negate the lawfulness of the initial arrest attempt, or negate the unlawfulness of the criminal defendant's attempt to resist it.'"

*Id. Yount* "emphasized that the validity of a conviction of an offense involving a peace officer engaged in the performance of his or her duties depends on whether 'the officer was acting lawfully *at the time* the offense against the officer was committed.'" *Id.* at 87 (emphasis in original); *see also Sanford v. Motts*, 258 F.3d 1117, 1120 (9th Cir. 2001) (stating that, if the officer used "excessive force subsequent to the time Sanford interfered with [the officer's] duty, success in her section 1983 claim will not invalidate her conviction[;] *Heck* is no bar").

The *Williams* court added that

> the rule proposed by defendant "could lead to absurd results." A defendant who has resisted, obstructed, or delayed an officer who is lawfully performing his or her duties would have an inducement to escalate his or her conduct in hopes that an officer will respond excessively and thereby render the arrest unlawful. Logically, the use of excessive force after a defendant's completed section 148(a)(1) offense should not provide a basis for finding the defendant did not violate section 148(a)(1).

*Id.*

The Court finds the analysis in *Williams* persuasive. Accordingly, so long as there was probable cause to arrest the Flynns for a violation of § 148(a)(1) (*i.e.*, refusal to comply with ejection), the fact that the individual officers *subsequently* used excessive force is, in effect,

irrelevant.[6]  In short, the use of the excessive force did not negate any § 148(a)(1) violation.  To the extent the Flynns still argue that there are questions of fact that should preclude dismissal at the 12(b)(6) phase – *e.g.*, was any refusal to comply with ejection actually completed before the excessive force was used – the Court notes that probable cause only requires a fair probability that a violation of § 148(a)(1) had taken place.  Based on the allegations in the complaint, there was a fair probability that the Flynns had violated § 148(a)(1) because they did not comply with the officers' attempts to remove them from the stands.  Moreover, even if there were a close call on probable cause, at the very least the individual officers would be protected by qualified immunity (*i.e.*, any mistake made by the officers as to an arrest under § 148(a)(1) was a reasonable one).

### b.  Ms. Alcarez

For Ms. Alcarez, the analysis is different.  According to Defendants, there was probable cause to arrest Ms. Alcarez for a violation of § 148(a)(1) because she grabbed the baton being used on Patrick Flynn and thus interfered with an officer's discharge or attempted discharge of his or her duties.  In response, Ms. Alcarez argues that she could not have been found guilty of a § 148(a)(1) violation because the officer was using excessive force on Patrick and thus she was entitled to defend Patrick.

The problem for Ms. Alcarez is that it is not clear that "defense of others" is a defense to a § 148(a)(1) violation.  Admittedly, "[i]f a peace officer uses unreasonable or excessive force while . . . arresting or attempting to arrest . . . a person, that person may lawfully use reasonable force to defend himself or herself."  CALCRIM 2670.  But California law cognizant of, in essence, self-defense does not automatically translate to recognition of "defense of others" as a viable theory.  *See People v. Salazar*, No. B235685, 2013 WL 1963939, at *8 (Cal. Ct. App. May 14, 2013) (in unpublished decision, stating that "[a] person 'may use reasonable force to defend life and limb

---

[6] Even if *Williams* had never been decided, there might still be reasons to distinguish *White*.  *See, e.g.*, *Van Wickler v. City of Santa Cruz/ Santa Cruz Police Dep't*, No. CV-04-01792-JF, 2004 U.S. Dist. LEXIS 20390, at *10 (N.D. Cal. Oct. 1, 2004) ("Plaintiff cites no authority holding or suggesting that the legal standard for negating the 'lawful arrest' element of a § 148 criminal charge has any relevance to a civil plaintiff's burden of showing that an arrest was unlawful in the first instance.  The adequacy of Plaintiff's allegation that the officers used excessive force is not challenged by the City and is separable from his claim of unlawful arrest.").

19

against excessive force'"; then assuming, as the parties did, that "a person may also defend a third person against excessive force"). The Court therefore finds that, based on the allegations in the complaint, there was probable cause to arrest Ms. Alcarez but, even if not, at the very least, qualified immunity protects the individual officers as there was no clearly established law holding that defense of others is a legal defense to a § 148(a)(1) violation.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss. More specifically, the Court rules as follows.

(1) The motion to dismiss the First Amendment retaliation claim based on Kyle's flipping off Giants players and yelling, "You fucking suck!" is granted, but with leave to amend. In the amended pleading, Kyle must make factual allegations to support their position that Levi's Stadium is a public forum (*i.e.*, a designated public forum). Kyle must also include factual allegations as to the knowledge of each individual officer with respect to his speech.

(2) The motion to dismiss the First Amendment retaliation claim based on Patrick Flynn's taking a knee is granted, but with leave to amend. In the amended pleading, Patrick must include factual allegations as to the knowledge of each individual officer with respect to his speech.

///
///
///
///
///
///
///
///
///
///

20

(3) The motion to dismiss the false arrest claims is granted without leave to amend. Based on the allegations in the complaint, the police officers had probable cause to arrest both the Flynns and Ms. Alcarez for a violation of § 148(a)(1). Moreover, the individual officers had qualified immunity to arrest for a violation of § 148(a)(1). The individual officers also had qualified immunity to arrest the Flynns for a violation of § 9.05.160(g).

Plaintiffs shall file their amended complaint within four weeks of the date of this order. This order disposes of Docket No. 31.

**IT IS SO ORDERED**.

Dated: May 22, 2019

_____
EDWARD M. CHEN
United States District Judge